[No. 1938.]

## M. Shubert v. The State.

1. **Pleading.**— Indictments may include as many counts as may be necessary to meet every possible contingency of the evidence, and such pleading is to be commended.

2. **Same.**— Indictment for fraudulently taking into possession and driving from its range an animal belonging to another is not objectionable because it uses the word "deprive" instead of the statutory word "defraud" in alleging the intent with which the animal was taken from the possession of the owner.

3. **Theft — Venue.**— Article 749 of the Penal Code declares that, if any person shall wilfully take into possession, and drive, use or remove from its accustomed range, any live stock not his own, without the consent of the owner, and with intent to defraud the owner thereof, he shall be deemed guilty of theft, etc. Under the provisions of article 216 of the Code of Criminal Procedure, theft may be prosecuted in the county of the original taking or in any county through or into which the thief may have taken the property, and this provision applies to all species of theft. It is sufficient, therefore, in charging the offense described in article 749 of the Penal Code, to allege

the venue in the county into which the stock was driven, and such allegation is supported by proof that the stock was taken from the range in another county.

4. PRACTICE — CHARGE OF THE COURT. — See the statement of the case for a charge of the court defining the term "wilful," which, though not as full as it properly might have been, is *held*; in the absence of a bill of exceptions, to be sufficient.

5. SAME. — EXCEPTION to the action of the trial court in refusing special instructions must be presented by proper bill. However correct the requested instruction may be, a conviction will not be reversed for its refusal, in the absence of a proper bill of exceptions, unless its refusal comprehended a fundamental error, or, under the peculiar circumstances of the case, worked obvious prejudice to the defendant.

6. SAME. — BILLS OF EXCEPTIONS which appear not to have been presented, filed and approved within ten days after the date of the conclusion of the trial of the case will not be considered on appeal.

7. WILFULLY DRIVING STOCK, ETC. — FACT CASE. — See the statement of the case for evidence which, though circumstantial, is *held* sufficient to support a conviction for wilfully driving stock from its accustomed range without the consent of the owner and with the intent to defraud the owner.

APPEAL from the District Court of Travis. Tried below before the Hon. A. S. Walker.

The indictment, in three counts, charged the appellant and A. Elsner jointly, first with wilfully taking into their possession, driving, using and removing from its accustomed range a certain horse, the property of Phil. P. Cage, T. E. Cage and J. J. Cage, composing the firm of Phil. P. Cage & Brothers, without the consent of the said owners or either of them, and with the fraudulent intent to deprive the said owners thereof; second, with the theft of the said horse; and third, with unlawfully and fraudulently receiving and concealing the said animal, knowing that the same had been stolen. The offense, in each count, was alleged to have been committed on or about the 4th day of June, 1885, and the venue in each count was laid in Travis county. A severance being awarded, the appellant was first placed upon trial and was convicted upon the first count, his punishment being assessed at a term of two years in the penitentiary.

J. K. Warren was the first witness for the State. He testified that he was the hide and cattle inspector of Travis county, Texas, and held that office in June, 1885. He first met the defendant one day in June, 1885, when he inspected some horses claimed by defendant and one A. Elsner. The inspection was made at the shipping pens in the city of Austin. The witness had heard that some horses were at the depot, being held in readiness for shipment, and

had been informed by his deputy, Mr. Gaines, that the parties who had them in charge claimed to have had them inspected at Manchaca, in Travis county. As the witness had no deputy stationed at Manchaca, he concluded to investigate the matter. He met the defendant at the depot, who told him that he had some horses there which he intended to ship on that evening or night. Witness asked him to show his inspection papers. He replied that his partner, A. Elsner, then at Schneider's store, had the papers in charge. Witness claimed the authority to examine the papers and to re-inspect the horses. The defendant replied that the horses were regularly inspected in Hays county; that he and Elsner held inspection papers from Hays county, and did not want them inspected again, and did not want to pay inspection fees a second time. Witness then demanded the inspection papers for examination. Defendant went off and soon returned with Elsner, when witness demanded the papers and claimed the right to re-inspect the horses. They said that the horses were theirs; had been inspected in Hays county; that the bunch contained no horses not mentioned in the inspection papers, which they exhibited to witness, and which the witness returned to them at their request; that they did not want a re-inspection; that they had shipped horses before and had never been called upon to submit to and pay for a second inspection, and that rather than submit in this instance they would drive the horses back to Hays county and ship them from Kyle. Witness insisted upon his right to inspect the horses, and the railroad agent notified defendant and Elsner that he would not ship the horses without the witness's inspection. Defendant and Elsner then said that they would go up town and consult an attorney about the matter. The parties then separating, the witness started up town, but, before he had gone a great distance, he concluded that, as it was growing late, he would have to inspect the horses then, if at all before night, and returned to the depot. After some search he found defendant and Elsner at Schneider's store, and told them that it was growing late and he wanted to inspect those animals before dark. They protested again in the terms they had used before, and said that they would drive the horses back to Hays county, and ship from Kyle, before they would submit to a second inspection. Witness told them that he was going to inspect the horses with or without their consent, and requested them to go with him while he did so. They went with him, still protesting against another inspection of their stock.

The horses were not at the shipping pens when witness, defendant and Elsner arrived, but were scattered along the river bank and

the railroad track, in charge of an American and a Mexican. The defendant and Elsner, at the request of the witness, had the horses rounded up and driven into the pens. As the bunch passed into the pen they said: "Those are our horses." Witness then demanded the inspection papers, for comparison with the brands of the horses. The defendant and Elsner retired and consulted for a short time, and then reluctantly gave witness the papers. Witness then had the horses driven from the larger pen into the smaller pen or chute, a few at a time, in order to inspect them carefully and compare their brands with the entries in the inspection papers. In the first bunch so driven from the large pen into the smaller pen, witness found and cut out two or three horses not described in the inspection papers. He found others in the subsequent drives from one pen to the other, until he cut out ten horses not entered on the inspection papers. When witness cut out the horses not mentioned in the Hays county inspection papers, he called defendant's attention to them, and to the fact that they were not mentioned in the papers. With reference to the horse described in the indictment, defendant said: "I know nothing about him. He is not mine." He then called Elsner and asked him: "What about this horse? I know nothing about it; it is not mine; what do you know about it?" Elsner replied that he knew nothing about the horse; that it was not in the bunch before the river was crossed, and that it must have gotten into the bunch on this side of the river. Both the defendant and Elsner disclaimed any knowledge of any of the horses not described in the Hays county inspection papers, and stated that they claimed only those described in the inspection papers. They denied ownership of the ten horses as the witness cut them out. Witness knew the Cage horse, which was among those not described in the Hays county inspection papers, and which was cut out. That animal was a mare, branded H D, counterbranded U 3, on the thigh, and the Blanco county brand 31. Witness took possession of the mare and held possession of her for the Cage Brothers, and held her until the Cages sent Mr. Haywood for her. Defendant and Elsner had the mare described in their possession in Travis county, Texas, on or about June 4, 1885. Defendant and Elsner had the stock at the shipping pens, which was the usual point of shipment from Austin.

Defendant and Elsner made no attempt to conceal any of the horses, so far as the witness could tell. They objected to inspection, but only, according to the witness's understanding, upon the ground that the horses had been once inspected, and they did not want to pay inspection fees a second time. Witness demanded the right to

re-inspect the horses mainly because the Hays county inspection papers held by defendant and Elsner were not recorded. He had no information nor suspicion that there was anything irregular or wrong about the defendant's or Elsner's possession of any one of the horses. He knew nothing about the horses prior to the inspection. The inspection papers were first placed in witness's hands at the depot, and then at the shipping pens. When defendant's attention was called to the horses not described in the inspection papers, both he and Elsner disclaimed ownership or knowledge of them. They disclaimed knowledge or ownership of the Cage horse, and did not ask witness to inspect that animal as theirs. Elsner declared that the horses not mentioned in inspection papers must have gotten into the bunch on the north side of the river, while they were scattered along the bank. Neither defendant nor Elsner requested witness to inspect any of the horses. The horses inspected by witness for them were the horses covered by the Hays county inspection papers; for which service defendant and Elsner paid him his fees. Those horses, seventy-five in number, were shipped on the next day. No claim to any of the ten horses not mentioned in the inspection papers was asserted by either defendant or Elsner, except their statement, as the horses were driven into the pens: "Those are our horses." The ten horses mentioned included a horse known as the " C D " horse. Witness went before Justice Von Rosenburg and filed a complaint against the defendant and Elsner for driving stock to market without bills of sale. He knew then to whom the horses belonged. He did not know the Cage brand until after this prosecution was instituted. The " C D " horse was a stallion which Elsner claimed as the foal of a mare he had raised. Neither Elsner nor defendant attempted concealment in their intercourse with witness, nor did they object to re-inspection upon any ground other than that the horses had been inspected once, and they did not want to pay inspection fees twice. Witness had no right to demand re-inspection except upon the irregularity of the Hays county inspection papers, which had not, as required by law, been recorded in Hays county. Witness had no reason, prior to his inspection, to suspect defendant and Elsner of having illegal possession of horses. The animals were kept by defendant and Elsner at the shipping pens in open daylight. The Hays county inspection papers called for seventy-four horses. By actual count witness found the bunch to contain eighty-four or eighty-five head.

Phil. P. Cage, the next witness for the State, testified that he was the senior member of the firm of Phil. P. Cage & Bros., merchants,

of the town of Blanco, Blanco county, Texas. His associates were his brothers, J. J. and T. E. Cage. Cage Brothers were the owners also of a stock ranche located about twenty miles distant from the town of Blanco. They had not yet gathered their stock to the ranche. Their horse-stock had been acquired a few at a time, and for the most part were taken in payment of debts. In most cases the horses thus purchased passed into their possession on their several ranges, and information concerning them was derived from visitors from the several neighborhoods. Witness knew little about his stock interests, his brothers being directly in charge of that branch of the business. The witness had never seen the mare described in the indictment until after her recovery from the defendant, and when she was taken back to Blanco by Mr. Haywood. The animal was bought a year or two prior to this trial. Witness had no personal knowledge of the animal or her range. He had never consented that any one should take her. Fisher's Store is from forty to fifty miles distant from Austin. In going from one point to the other, one would pass within fifteen miles of the town of Blanco.

T. E. Cage testified, for the State, that he knew the mare in question. She was purchased by Cage Brothers in 1883, and her range was supposed to be near Fisher's Store, which stands about the point where the counties of Hays, Comal and Blanco join. The animal was branded H D on the shoulder, counterbranded with the Cage brand U 3 on the thigh, and the Blanco county brand 31 on the neck. She was put in the Cage Brothers' brand in 1883, and was turned on the range near Fisher's Store, on which range witness saw her two or three times afterwards. Witness did not know when, from where, nor by whom the mare was taken at all. She was brought to the Cage Brothers at Blanco in the summer of 1885, by one Haywood, on an order from Cage Brothers on the hide and animal inspector of Travis county. The animal, if taken, was taken from the possession of the Cage Brothers without the knowledge or consent of the witness. Witness last saw the mare on her range in the summer of 1884, but heard of her on the range a short time before she was brought back from Austin.

J. J. Cage testified, for the State, substantially as did his brother T. E. Cage. Witness branded the mare in the Cage Brothers' brand and turned her upon her range, and had never seen her since until she was brought back from Austin. He heard of her frequently as being upon her accustomed range near Fisher's Store. If taken at all, she was taken from the possession of Cage Brothers, without the

knowledge or consent of the witness, but he could not say when, where, nor by whom. The State closed.

Stephen Cryer was the first witness for the defense. He testified that he had known the defendant for many years, during which he sustained an unimpeached reputation for honesty. Witness helped the defendant gather the horses which he drove to Austin about June 1, 1885. Witness saw all of the horses in defendant's drove on the day before defendant started with them to Austin. He saw them again that night in the defendant's pen, and again next morning when defendant started with them to Austin. Witness did not examine all of the brands critically, but saw and believed he knew all the horses in the drove, as he was familiar with all the horse stock on the range. He saw no horses either in the defendant's pen or in his drove which the defendant had not gathered as his own or bought to drive to Austin. Witness, at no time, saw the Cage mare among defendant's horses, though it was not impossible for her to have been among them. Witness drove a team to Austin on the next day and passed the drove of horses of the defendant and Elsner at Coxe's (or Huddlestone's) pasture, north of Onion creek in Hays county, Texas. He saw no new horses in the bunch, and, though he did not examine critically, he did not think there were any horses in the bunch other than those with which they had started. Witness saw the Cage horse at Austin, but was certain it was not in defendant's bunch at defendant's pen, either on the night before, or on the morning when the horses were started to Austin, and he did not think it was in the bunch at Coxe's pasture. Witness knew defendant's horses well, and knew that the Cage horse was not among them at defendant's ranche. He knew this fact as well as he could know it by going into the pen and through the bunch. Defendant and Elsner were not partners in the drove of horses, but each owned and gathered his horses separately. They drove their horses to Austin together, as a matter of convenience, and to enable them to have jointly a full car-load in shipping. Witness was not related either to the defendant or Elsner, and had no interest in the issue of this prosecution, of a personal character. He sold defendant some horses, and helped him gather the stock for shipment, and there his connection with this affair terminated. Witness was tolerably familiar with the horse stock on the range from which the drove of defendant and Elsner were gathered. He had never seen the Cage mare on that range, and thought that, if she had ever been on that range, she would not have escaped his observation. Defendant lived in Hays county about five miles east from Fisher's Store, and it was

from his house that he drove the horses to Austin. "I am sure I did not see the horses taken by Warren in Shubert's herd the day he started to Austin, but I only saw a small bunch, eight or ten in all, and I cannot say what horses, if any, were put into the herd after I left it."

H. H. Sloan was the next witness for the defense. He testified that he lived in Blanco county, three miles distant from Fisher's Store. In June, 1885, he lived on the defendant's place. He was in defendant's pen, and saw the horses on the morning that defendant started with them to Austin. He did not examine the horses critically, but walked through the pen and took a general look at them. So far as the witness could see, and he saw all of the horses, there were none in the pen but such as belonged to the defendant. Those horses were gathered publicly, in daylight, and no attempt at concealment was made, so far as the witness could see. Witness saw nothing more of the drove of horses after he went through them on that morning. He did not see the horses when they left the defendant's house, but knew that they left on that morning, and that they had not then been inspected. Elsner lived on the Guadalupe river, in Comal county. Witness did not know when nor where Elsner gathered his horses. Witness had known defendant for ten years, and knew that during that time defendant's reputation for honesty was good. The indictment for horse theft returned against defendant in Blanco county grew out of this same transaction.

Louis Cours testified, for the defense, that he helped Elsner gather his horses, and drove them to defendant's pen on the night before they were taken from defendant's house to Austin. The witness was in the employ of Elsner, and had nothing whatever to do with defendant's horses, and knew nothing about when or where they were gathered. He saw all of the horses of Elsner and the defendant in the pen. They owned their horses separately but were driving them in connection. Witness went with the horses from defendant's pen to Austin, and at no time or place on the drive, south of the Colorado river, did he see any of the horses taken by Warren at Austin, in the bunch. Some horses belonging to Elsner were put into the drove at the Coxe pasture, on Bear creek, about twenty miles from defendant's place. No other horses were added to the bunch. Elsner owned fifty or more of the horses in the drove and defendant the remainder. The drove left defendant's pen between 9 and 10 o'clock A. M. They were taken to Coxe's pasture, and defendant and Elsner went to Kyle or San Marcos to get the cattle and hide inspector to inspect them. Mr. Barbee in-

spected the horses on the next evening. With the drove, including the few head added to Elsner's horses at Coxe's, the parties went on to Austin. The horses inspected by Barbee numbered seventy-four head in all. Witness knew all of Elsner's horses, and saw all of defendant's. The Cage mare was not in the bunch at defendant's pen, at Coxe's pasture or at the time the river was crossed at Austin. Near Oatmanville a Mexican named Peter was met, and was hired by Elsner and the defendant to help on the remainder of the drive to Austin. Peter was with the herd when they crossed the Colorado river, and afterwards when the horses were turned loose near the shipping pens, on the Austin side of the river. The river was forded about 4 o'clock in the evening. The horses were turned loose to graze up and down the river and railroad, in charge of the witness and Peter, and Elsner and defendant went up town. They returned near night with Mr. Warren, and defendant directed witness to round up and pen the horses; which he did. The horses were then inspected, a few at a time, by Warren. Witness heard a part of the conversation between defendant, Elsner and Warren. He heard defendant say that he did not want to submit to and pay for a second inspection. Among several horses, not included in the inspection papers, found in the herd by Warren was the Cage mare. Witness did not know how that mare got into the herd. He did not see her in the herd until Warren cut her out. None of the horses cut out by Warren were in the herd when the river was crossed. Witness did not count the horses before crossing the river. The herd was driven from the range about the corner of Hays, Comal and Blanco counties. Witness was a son-in-law of Elsner, and was in his employ.

J. C. Prade testified, for the defense, that he was in charge of the stock shipping department of the business at the railroad depot in Austin. It is required of the shipper to produce inspection papers, and the stock is shipped upon such papers. Stock is never shipped without inspection, and no stock in excess of the number called for in the inspection papers is ever knowingly permitted to be shipped. It is not impossible for horses to be shipped without inspection. The company, however, is liable only for the animals called for in the inspection papers by which they were shipped. The brands and count are never verified, and the practice is to accept the statement of the inspector to the effect that the herd is all right.

Pedro Vidal testified, for the defense, that he lived above Oatmanville, in Travis county, Texas. On his way to Austin in June, 1885, he overtook the defendant and Elsner *en route* to Austin with a herd

of horses.    Witness knew Elsner, and was engaged by him and defendant to help drive the horses on to Austin.    They told witness that he was needed to help their American hand to tend the horses after the river was crossed.    After crossing the river the horses were allowed to stray over the sandbar extending up and down the river and railroad, and Elsner and defendant went on up town.    When the horses belonging to the Elsner and Shubert bunch were first driven to the shipping pens, the witness saw a small bunch of horses near a neighboring brick-yard or gravel-pit.    The bunch numbered some six, eight or ten.    The two bunches became frightened at the blowing of the whistle of an incoming locomotive, ran together and got mixed.    They were not afterwards separated that the witness knew.

Folts, Shackleben and Schneider testified that they had each known the defendant for several years, and knew that he had, during their acquaintance with him, sustained a good reputation for honesty.

A. M. Perry testified, for the State, in rebuttal, that he had known the defendant for six years.    His reputation for honesty was bad.    He was a reputed horse thief.    Three or four additional witnesses testified for the State that the defendant's reputation for honesty was bad.

The charge of the court referred to in the fourth head-note of this report reads as follows:  " By *wilfully* in above charge is meant that the act was done without any claim or right in the mare."

The motion for new trial raised the questions discussed in the opinion.

*Dowell & Wooten,* for the appellant.

*J. H. Burts,* Assistant Attorney-General, for the State.

WILLSON, JUDGE.  Defendant was indicted jointly with one Elsner. There are three counts in the indictment, to wit, the first charging that the defendants " did unlawfully, wilfully and fraudulently take into their possession and drive, use and remove from its accustomed range a certain horse, the same being the corporeal personal property of Phil. P. Cage, T. E. Cage and J. J. Cage, who compose the firm of Phil. P. Cage & Brothers, without the consent of the said owners or either of them, and with the fraudulent intent to deprive the said Phil. P. Cage, T. E. Cage and J. J. Cage thereof."  The second count charges, in the usual form, the theft of the same

animal; and the third count charges that the defendants did unlaw-
fully and fraudulently receive and conceal said animal, knowing
that the same had been stolen. In each count the venue of the
offense is alleged in Travis county. Defendants severed and M.
Schubert was placed upon trial first, and was convicted upon the
first count in the indictment.

I. The exceptions to the indictment were properly overruled. It
is not only permissible, but commendable, to insert in an indictment
as many counts as will be necessary to provide for every possible
contingency in the evidence. (Code Crim. Proc., art. 433; *Gonzales*
v. *The State*, 12 Texas Ct. App., 657; *Boles* v. *The State*, 13 Texas
Ct. App., 650.) Whilst the first count does not charge the offense
defined in article 749 of the Penal Code in the precise words of that
statute, in that it uses the word "deprive" instead of "defraud," it
is nevertheless alleged that the animal was *fraudulently* taken, etc.,
and this is equivalent to the statutory language and sufficient.
(*Thompson* v. *The State*, 16 Texas Ct. App., 74; *Fowler* v. *The State*,
38 Texas, 559; Willson's Cr. Forms, No. 476, p. 207.)

II. As to the venue of the offense of which defendant has been
convicted, it was properly alleged, and sufficiently proved to be, in
Travis county. The offense is declared to be *theft*. (Penal Code,
art. 749.) Theft may be prosecuted not only in the county where
the property was taken, but in any county through or into which
the thief may have carried the same. (Code Crim. Proc., art. 216.)
This provision applies to all species of theft, and the learned trial
judge did not err in his view of the law as to the venue of the
offense. Although the accustomed range of the animal may have
been in some other county than Travis, it was not necessary that
the indictment should allege such other county in which such range
was located, and it was competent to prove the range to be in any
county, and the indictment alleging it to be in Travis county was
supported by proof that the animal was taken from its range in
another county and brought by the defendant into Travis county.

III. No exceptions were saved to the charge of the court. In
our opinion the charge is free from any material error. While the
definition of the word "wilful" is not as full as it might properly
have been, still we think, in the absence of any exception made
thereto at the time of the trial, the definition as given is sufficient.
(*Owens* v. *The State*, 19 Texas Ct. App., 242.)

IV. Three special charges were requested by the defendant, and
were refused. The first, relating to the venue of the offense, was
not correct in principle and was properly refused. The second, de-

fining possession of property, and the third, concerning the explanation made by defendant of his possession of the animal when such possession was first challenged, might very properly, we think, have been given, but we cannot say that their refusal was fundamental error, or error which, under the facts of the case, was calculated to injure the rights of the defendant. If the action of the court refusing these two charges had been excepted to at the time of trial, and the exception reserved by bill filed in proper time, we would have reversed the judgment for this error. There are in the record several bills of exception, and among them are two covering these refused charges, but none of the bills were presented, approved and filed within ten days after the date of the conclusion of the trial, and cannot therefore be considered.

V. There remains but one question to be determined, and that is the sufficiency of the evidence to support the conviction. Whilst the evidence is entirely circumstantial, and in some respects not as cogent as it perhaps could have been made, we are not prepared to say that it is insufficient to support the verdict. It was sufficiently proved, we think, that the accustomed range of the animal was fifty miles distant from the place where she was found in the joint possession of defendant and Elsner. This range was near to the range of horses belonging to the defendants, and from which vicinity defendants had gathered the animals composing their herd, in which herd this animal was found after the arrival of the herd at Austin. There were also found in the same herd at Austin eight or nine other animals which did not belong to the defendants or either of them, two of which animals were in the *fleur de lis* brand, and two animals in this brand were in Coxe's pasture when and where defendants' herd were first inspected, said pasture being in Hays county. It was not shown, however, that the two animals bearing said brand, and seen in said pasture, were the same animals of that brand found in defendants' herd at Austin, nor was it shown that the range of animals in said brand was in Hays county, and that said range did not extend across the Colorado river and include the vicinity of Austin. But, leaving out of view the evidence as to the animals in the herd not inspected in Hays county and not claimed by defendants when found in their herd, and looking alone to the Cage mare, the animal named in the indictment, we find said animal fifty miles distant from its accustomed range in another county, on the east side of the Colorado river, the opposite side of said river from its range, and in the herd of the defendants, and at a place where it is not to be presumed that horses usually run at large with-

out being known. We find, further, that the herd in which this animal was found was gathered by defendants partly in the same range in which this animal was accustomed to run and had run for years. We find, further, that defendants had their herd inspected in Hays county, near Kyle, a railroad station and shipping place for stock, and in a pasture containing some fifty head of horses not embraced in the inspection. No reason appears why the herd was not shipped in the county of its inspection instead of being driven thirty-five or forty miles to another place of shipment.

Such being the evidence, we think it warrants the conclusion of the jury that the animal was removed from its accustomed range by the defendants, wilfully and with intent to defraud. As to the defendants' explanation of their possession of the animal, it was the province of the jury to determine, first, whether it was a reasonable one, and, second, whether, if reasonable, it was not disproved by the evidence in the case. There was testimony on the part of the defense proving the truth of such explanation, but the jury were the judges of the credibility of this testimony, and their verdict shows that they did not give it any credence. The evidence in behalf of the State, we think, justified the jury in regarding the explanation as unreasonable and improbable, and a fabrication.

Impressed as we have been by a careful consideration of the evidence as it is presented in the record, we must hold that it sustains the conviction. The judgment is affirmed.

*Affirmed.*